# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| VICTOR SALAZAR,<br><br>    Plaintiff,<br><br>vs.<br><br>RANDY BLADES; DAVINA LAU; DEPUTY WARDEN CHRISTIANSEN; IDOC INVESTIGATOR BONGIOVI; IDOC INVESTIGATOR MAES; and KEVIN KEMPF<br><br>    Defendants, | Case No.: 1:16-CV-00041-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT (Dkt. No. 49)**<br><br>**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT (Dkt. No. 53)**<br><br>**PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL PLEADING (Dkt. No. 58)** |

    Pending before the Court are: (1) Defendants' Second Motion for Summary Judgment (Dkt. 49); (2) Plaintiff's Cross-Motion for Summary Judgment (Dkt. 53); and (3) Plaintiff's Motion for Leave to File Supplemental Pleading (Dkt. 58). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. GENERAL BACKGROUND

    Plaintiff Victor Salazar is a prisoner in the custody of the Idaho Department of Correction ("IDOC), currently incarcerated at the Idaho State Correctional Institution ("ISCI"). Plaintiff's claims originally arose out of two physical altercations while at the Idaho State Correctional Center ("ISCC") – the first on December 3, 2014; the second on August 28, 2015. In each instance, Plaintiff claims to have been attacked by Norteño gang members.

**MEMORANDUM DECISION AND ORDER - 1**

Concerning the December 3, 2014 incident at ISCC, Plaintiff claims that, as a *former* Norteño gang member, he was specifically "green-lighted". *See* Pl.'s Brief ISO MSJ 2 (Dkt. 53-1) (describing "green-lighting" as being "targeted . . . by a gang you were once of member of, [where] the assaults would continue until you were physically incapacitated or dead."). Though claiming that his involvement in the December 3, 2014 fight was limited to self-defense, Plaintiff was issued a Disciplinary Offense Report ("DOR") for fighting. *See* Pl.'s Obj. to MSJ 9 (Dkt. 29-2). That DOR was ultimately dismissed on December 22, 2014 and, after informing Defendant Randy Blades (Warden at ISCC) of the events leading up to the December 3, 2014 attack, Plaintiff was transferred to ISCI – ostensibly for his own safety and protection. *See id.*; *see also* Exs. C, D to Obj. to MSJ (Dkt. 29-3).

However, despite the December 3, 2014 incident alongside his claimed warnings about being returned to ISCC, Plaintiff was transferred *back* to ISCC on August 28, 2015 where he was promptly involved in another incident with Norteño gang members – this time, Plaintiff admits that he initiated the fight and was issued a DOR, explaining during oral argument that he "had to fight" in the sense of self-preservation. *See* Compl. 2 (Dkt. 3); *see also* Ex. A to Am. Compl. (Dkt. 43-1) (December 10, 2015 "Offender Concern Form" from Plaintiff to Warden Blades, stating: "Sir on 12/3/14 I as jumped there at ISCC. After speaking to you about this situation you had me moved to ISCI for my protection. On 8/28/15 I was sent back to ISCC from ISCI and got into a fight and broke my hand. Sir it is clear my civil rights have been violated – the IDOC staff has done nothing to prevent this from happening . . . .").

Representing himself, Plaintiff brought this action on January 26, 2016, asserting Eighth Amendment failure-to-protect claims against Defendants Kevin Kempf (IDOC Director), Warden Blades, Davina Lau (ISCI Transfer Coordinator), Jay Christensen (Deputy Warden at ISCC), and ISCC Investigators Bongiovi and Maes. *See generally* Compl. On April 7, 2016, the

**MEMORANDUM DECISION AND ORDER - 2**

Court reviewed Plaintiff's Complaint pursuant to 28 U.S.C. § 1915 and 1915A and allowed Plaintiff to proceed on Eighth Amendment failure-to-protect claims based on the two incidents as well as injunctive relief.  *See* 4/7/16 IRO 6-7 (Dkt. 8) ("Plaintiff's Complaint, liberally construed, appears to state colorable Eighth Amendment claims against Defendants Blades, Lau, Christensen, Bongiovi, and Maes for damages and injunctive relief.  Plaintiff has sufficiently alleged that he informed each of these Defendants that he was in danger of attack at ISCC, but that none of them acted to protect him.  Plaintiff may also proceed on a claim for injunctive relief against Defendant Kempf, who – as the Director of the IDOC – appears to have direct responsibility for the conditions of confinement at Idaho prisons.  However, because the Complaint does not allege that Defendant Kempf (1) was aware of the danger to Plaintiff at ISCC prior to his transfer to ISCC, (2) personally participated in the decision to transfer Plaintiff, or (3) is subject to personal liability as a supervisor, Plaintiff has not stated a plausible claim for monetary damages against Kempf in his individual capacity.") (internal citations omitted).

On June 23, 2016, Defendants moved for summary judgment, arguing that Plaintiff's claims should be dismissed for failure to exhaust his administrative remedies.  *See generally* Defs.' Mem. ISO MSJ (Dkt. 16-1).  While that motion was pending, on October 26, 2016, Plaintiff moved to amend his Complaint, again raising failure-to-protect claims relating to the above-referenced December 2014 and August 2015 incidents, *in addition to* a third altercation at the Idaho Maximum Security Institution ("IMSI") on April 27, 2016.  *See* Pl.'s Mot. to Am. (Dkt. 26); *see also* Prop. Am. Compl. (Dkt. 26-1).  Even though IMSI is a different prison from ISCC (where Plaintiff was previously attacked), Plaintiff claims that a Norteño gang member – who should have been placed in administrative segregation – was instead moved from ISCC to IMSI and placed on the same housing tier as Plaintiff where he attacked Plaintiff on April 27, 2016.  *See id*. at 5.

**MEMORANDUM DECISION AND ORDER - 3**

On March 16, 2017, the Court agreed with Defendants and granted their Motion for Summary Judgment, determining that "Plaintiff did not properly exhaust available administrative remedies as to his claims arising from the December 2014 and August 2015 attacks." 3/16/17 MDO 13-14 (Dkt. 42); *see also id*. at 15 (additionally concluding that, even if Plaintiff properly grieved issue of April 27, 2016 attack, it "cannot serve to exhaust his claims arising from the December 2014 and August 2015 attacks"). The Court also granted Plaintiff's Motion to Amend, at least insofar as adding the April 27, 2016 attack as the support for his legal claims. *See id*. at 5 ("Amendment with respect to Plaintiff's claims arising from the first two attacks, in December 2014 and August 2015, is futile because . . . Plaintiff did not exhaust available administrative remedies as to those claims. Therefore, Plaintiff's Motion to Amend will be denied in part. The Motion will be granted with respect to Plaintiff's claim based on the April 2016 incident, as Defendants do not oppose amendment for that purpose."). Thus, Plaintiff's failure-to-protect claims have evolved to relate only to the April 27, 2016 attack at IMSI.

On October 26, 2017, Defendants moved for summary judgment on Plaintiff's claim that Defendants failed to protect Plaintiff from attack on April 27, 2016 in violation of his Eighth Amendment rights. Specifically, Defendants argue that (1) the named Defendants must be dismissed because there are no allegations they had any role in the events leading up to the April 27, 2016 attack (none of them even work at IMSI);[1] (2) the official capacity claims against Director Kempf must be dismissed because (a) Plaintiff was permitted to proceed only on injunctive relief claims against Director Kempf, and (b) Plaintiff has not sought any injunctive relief from this Court; and (3) Plaintiff failed to take affirmative steps to reduce his risk of harm

---

[1] Defendants argue that, as to Director Kempf (who is no longer IDOC's Director), he did not personally participate in the April 27, 2016 attack but, regardless, Plaintiff can proceed against him only in his official capacity for injunctive relief. *See* Defs.' Mem. ISO MSJ 2, n. 5, 6 (Dkt. 49-2); *see also supra* (discussing Court's April 7, 2016 Initial Review Order); *infra*.

**MEMORANDUM DECISION AND ORDER - 4**

by alerting facility officials of the harm he believed he was facing and requesting protective custody. *See* Defs.' Mem. ISO MSJ 2-3.

Plaintiff rejects these arguments and, on November 9, 2017, moved for summary judgment himself. *See* Pl.'s MSJ (Dkt. 53). Plaintiff submits that "Defendants knew of the serious risk and harm to [him] at the hands of ex-gang members and after being informed through multiple avenues showed 'deliberate indifference' by placing [him] in non-secure housing in close proximity to ex-gang members, where he was assaulted on numerous occasions." Pl.'s Mem. ISO MSJ 1-2 (Dkt. 53-1).[2]

## II. DISCUSSION

### A. Legal Standards

#### 1. Cross-Motions for Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and

---

[2] Plaintiff has also moved to file "supplemental pleadings," wherein Plaintiff alleges that he continues to suffer from attacks from members of the Norteño gang (and/or be placed at risk for similar attacks). *See* Pl.'s Mot. for Leave to File Supp. Pldgs. 2 (Dkt. 58) ("On 1-16-18, I was attacked by a known gang member and suffered a broken eye socket, broken cheekbone, and broken nasal passage, as well as severe trauma to face and psychological trauma. . . . . On 1-31-18, just a couple days after my surgery, with no real recovery time, I was released from medical and was deliberately housed with known rival gang members . . . . As I returned to my unit, I was approached by some rival gang members and was threatened by violence because of my former status."). While the import of such a filing is questionable as to the particular claims raised within Plaintiff's Amended Complaint (relating, as it does, solely to the April 27, 2016 attack), the Motion is nonetheless granted to the extent it adds additional context to Plaintiff's overarching failure-to-protect allegations.

**MEMORANDUM DECISION AND ORDER - 5**

prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the court must not make credibility findings. *See id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). However, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

When parties submit cross-motions for summary judgment, the Court must consider each party's evidence, regardless under which motion the evidence is issued. *See Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011); *see also Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001) ("[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified, and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."). The Court must independently search the record for factual disputes. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no material factual disputes – does not vitiate the Court's responsibility to determine whether disputes as to material fact are present. *See id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To

**MEMORANDUM DECISION AND ORDER - 6**

carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the non-moving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000). This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *See Devereaux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by [his] own affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. Where reasonable minds could differ on the material facts at issue, summary judgment should not be granted. *See Anderson*, 477 U.S. at 251.

    2.    <u>Failure to Protect and Deliberate Indifference</u>

"Section 1983 does not create any substantive rights, but is instead a vehicle by which plaintiffs can bring federal constitutional and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citing *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 978 (9th Cir. 2004)). "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights." *Id.* (citation omitted). To state a valid claim under Section 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

Relevant here, Plaintiff alleges an Eighth Amendment violation based on a failure to prevent harm. The Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994). But not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the

**MEMORANDUM DECISION AND ORDER - 7**

victim's safety." *Id*. at 834. To establish a legally-sufficient failure-to-protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to that harm (the inmate's health or safety). *Id*.

A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety" – that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. A prisoner alleging an Eighth Amendment violation need not show that prison officials believed that harm would actually occur; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. A prison official's knowledge of the risk "can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it." *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004). A prison official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Further, the mere negligent failure to protect a prisoner from assault does not comprise a constitutional violation. *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

**B.    Questions of Fact Preclude the Dismissal of the Entirety of Plaintiff's Eighth Amendment Claims on Summary Judgment**

Although Plaintiff is currently incarcerated at ISCI, the genesis of his current claims against Defendants relates to two confrontations with other prisoners while housed at ISCC. In particular, Plaintiff alleges that the facts of, and circumstances surrounding, these two altercations, coupled with his repeated, communicated concerns over being housed with/near Norteño gang members (owing to his status as a former Norteño gang member), put Defendants

**MEMORANDUM DECISION AND ORDER - 8**

on notice that he would be in physical danger if ever housed amongst Norteño gang members; and that, in so housing Plaintiff at ISCC (and later at IMSI), Defendants were deliberately indifferent to such dangers in violation of the Eighth Amendment. *See* Pl.'s Opp. to MSJ 4 (Dkt. 52-2) ("[I]n this case, the defendants have failed to observe blatant and obvious signs concerning Plaintiff's safety and Plaintiff was assaulted time and time again because of it."). Plaintiff's claims in these respects are framed in part by his written communications with prison officials prior to the April 27, 2016 attack,[3] including the following:

- 12/10/15 "Offender Concern Form" to Warden Blades: "Sir on 12/3/14 I as jumped there at ISCC. After speaking to you about this situation you had me moved to ISCI for my protection. On 8/28/15 I was sent back to ISCC from ISCI and got into a fight and broke my hand. Sir it is clear my civil rights have been violated – the IDOC staff has done nothing to prevent this from happening – IDOC purposely, knowingly, and willingly put my life and limb in jeopardy – I'd like to further exhaust my remedies – Thank you." Ex. A to Am. Compl.

- 12/10/15 "Offender Concern Form" to Warden Yordy: "Sir on 12/3/14 I was jumped at ISCC. After speaking with Warden Blades, I was moved here at ISCI for my protection. On 8/28/15 I was sent back to ISCC from ISCI and got into a fight and broke my hand. The IDOC staff has done nothing to prevent this from happening – IDOC purposely, knowingly, and willingly put my life and limb in jeopardy – I'd like to further exhaust my remedies – Thank you." Ex. C to Am. Compl. (Dkt. 43-1).

- 12/22/15 "Grievance/Appeal Form": "On 12/3/14 I was jumped at ISCC after speaking with Warden Blades I was moved to ISCI for my protection. On 8/28/15 Warden Yordy sent me back to ISCC. I got into a fight and broke my hand. Both Wardens Yordy of ISCI and Blades of ISCC has done nothing to prevent this from happening. Wardens Yordy and Blades have purposely, knowingly, and willfully put my life and limb in jeopardy." Ex. A to Am. Compl.

- 12/23/15 "Grievance/Appeal Form": "On 12/3/14 I was jumped at ISCC. After speaking with Warden Blades, I was moved to ISCI for my protection. On 8/28/15 Warden Yordy sent me back to ISCC. I got into a fight and broke my hand. Warden Yordy has done nothing to prevent this from happening. Warden Yordy purposely, knowingly, and willingly put my life and limb in jeopardy." Ex. C to Am. Compl.

---

[3] The record also contains numerous written communications following the April 27, 2016 attack. *See, e.g.*, Exs. F-m to Am. Compl. (Dkt. 43-1). These records do not obviously inform what prison officials knew or should have known *prior to* April 27, 2016.

**MEMORANDUM DECISION AND ORDER - 9**

- 1/1/16 "Offender Concern Form" to Deputy Warden Christiansen: "Sir on 12/3/14 I was jumped there at ISCC. After speaking with Warden Blades I was moved to ISCI for my protection. On 8/28/15 I was sent back to ISCC from ISCI and got into a fight and broke my hand. IDOC staff has done nothing to prevent this from happening. IDOC staff purposely, knowingly, and willingly put my life and limb in jeopardy." *Id.*

- 3/4/16 "Offender Concern Form" to Deputy Warden Christiansen: "Sir you knew or should have known of the immediate danger and threat that awaits me here at this facility. Your willful negligence has led to my life and limb [being] put in jeopardy twice now. Due to a lawsuit against you and the rest of your facility heads and staff, I feel your actions were on purpose to cause harm and will now be considered an act of retaliation and brought to court." *Id.*

- 3/4/16 "Offender Concern Form" to "Investigations": "Sir you . . . have known of the immediate threat that transferring me to this institution would have on my life and limb. I feel your actions were negligent [and] even done on purpose to cause harm due to a lawsuit against you. Your actions will be considered an act of retaliation and brought to court." Ex. D to Am. Compl. (Dkt. 43-1).

- 3/10/16 "Offender Concern Form" to "Investigations": Sir I've been on detention and "SPI" at three different institutions now for the same reasons now. Sir you knew or should have known of the potential danger or threat I faced going to the institution. Sir I should not be punished by being held "SPI" for no reason of my own —I did nothing wrong. Sir by having information on my situation and still letting staff cell me up with Norteño gang members is reckless and by doing so you knowingly, willfully, and purposely put my life and limb in jeopardy." Ex. E to Am. Compl. (Dkt. 43-1).

- 3/17/16 "Grievance/Appeal Form": "On 3/1/16 ISCC Staff Investigations Facility Heads put my life and limb in jeopardy for the fourth time. ISCC staff knew or should have known of the immediate threat and danger that awaited me there at ISCC – ISCC staff purposely, knowingly, and willingly put my life and limp in jeopardy." Ex. D to Am. Compl.

- 3/23/16 "Offender Concern Form" to Warden Blades: "Sir on 3/1/16 you received me into your facility knowing or should have known of the immediate threat and danger I faced there at your facility. Your willful negligence has lead to my life and limb being put in jeopardy three times now. Due to a lawsuit against you and other staff at your facility I feel your actions were on purpose to cause harm and now be considered an act of retaliation." Ex. E to Am. Compl.

*Compare with* Ex. B to Mabe Aff. ISO Defs.' MSJ (Dkt. 16-7) (listing Plaintiff's grievance history using "Corrections Integrated System" since December 2014; Ex. B to Whittington Aff. ISO Defs.' MSJ (Dkt. 16-9) (same).

**MEMORANDUM DECISION AND ORDER - 10**

Such correspondence unquestionably indicates that Plaintiff was very concerned about where he was being housed and how prison officials repeatedly disregarded his related safety concerns which, according to Plaintiff, resulted in him being attacked and suffering personal injury. Still, this correspondence is largely silent about tangible, verifiable threats to Plaintiff's safety – the actual *reasons* contributing to Plaintiff's housing concerns that arguably would have been understood by others and prompted alerts/cautions/red-flags in Plaintiff's file. *See, e.g.*, Defs.' Mem. ISO MSJ 4-5 ("The investigator from the August 2015 attack did not place an alert or caution in the system because Salazar provided no single verifiable threat to his safety.") (citing Defs. SOF ISO MSJ No. 16 (Dkt. 49-1) ("[Defendant] Bongiovi spoke with Salazar following the August 2015 attack. Based on the information provided by Salazar in August 2015 there was no verifiable information that Salazar faced a threat to his safety at that time. For that reason, there was insufficient information to place an alert or caution in the IDOC computer system related to Salazar's safety.").[4] In other words, without more, Plaintiffs' claims against the Defendants are too indefinite and opaque. But there is more (at least as to some Defendants).

Because of Plaintiff's pro se status and lack of familiarity with the Federal Rules of Civil Procedure and Evidence, during oral argument, the Court questioned Plaintiff about the April 27, 2016 attack and, specifically, the named Defendants' alleged involvement in that attack. In response, Plaintiff variously stated in relevant part:[5]

---

[4] Also problematic is Plaintiff's inability to consistently identify those persons allegedly responsible for the housing decisions that led to his injuries – i.e., those individuals who were allegedly deliberately indifferent to the dangers he claims to have faced. For example, in a May 16, 2016 "Grievance Form," Plaintiff indicates that he believed "staff (Lt. Overguard, Lt. Kimmel, Sgt. Govener, C/O Stokes, Sgt. Howard, D.W. Kirtley) all acted with deliberate indifference when they housed an active gang member with me . . . ." Ex. B to Am. Compl. (Dkt. 43-1). None of these individuals are named Defendants in the instant action.

[5] The Court has listened to the audio file of this portion of the July 9, 2018 oral argument many times to ensure the accuracy of Plaintiff's meandering statements as recounted here.

**MEMORANDUM DECISION AND ORDER - 11**

- <u>Investigators Maes and Bongiovi</u>: "After the 2015 assault, I spoke to Investigator Maes [and] Investigator Bongiovi . . . and informed them . . . I was just here prior and was assaulted in the 2014 incident. I told them this just happened to me and I was moved to ISCI for my protection and now I'm being brought back over here to the same place to the same unit with the same people that just assaulted me – the Norteño gang members that assaulted me. . . . . I'm talking to the Investigations and telling them that this had just happened recently – just months . . . prior to me coming there that day – and I told them . . . you guys put my life and limb in jeopardy by letting me come back over here and not having alerts on me or nothing. Putting me in the same place with the same people, only for me to have to fight my way out of that. I explained that that was absurd. They agreed. They apologized to me. They said that this rarely happens. They told me that I must have slipped through the cracks and they apologized and they were sending me back to ISCI for my protection, which they did. They gave me the DOR. Said that the only reason it did not get dropped – it wasn't because I was the aggressor – it's because I admitted to it already. I told them I'm not going to lie and say that I didn't fight to get out of there for my safety. . . . . So after speaking with Investigations, I was there a couple days and they sent me back to ISCI and that's that. And then I was there two months. And again they send me back to ISCC and then right off the bus I told them again [that] I can't go back there; you guys gotta talk to the Investigators, the Wardens. All these people know I can't be here. So they put me in the hole to investigate the whole thing. This was 2016. And after the whole investigation, I spoke with Maes and Bongiovi and I actually spoke to Christensen at this time and I sent them a concern form – all of these people I sent them concern forms. Hey, you know I can't be back here. You guys keep bringing me back here. I keep getting assaulted. And after that . . . . they sent me to IMSI . . . . for my protection. Few weeks later, getting assaulted over there, again. . . . . And by then, understanding that by moving me for my protection is ultimately them saying your safety is in jeopardy; we're moving you to another institution."

- <u>Investigator Bongiovi</u>: "In the 2015 assault, when I spoke with him . . . [he] comes to talk to me. . . . . After that assault, when they brought me to the institution in 2016 and I spoke to him and he was asking me what was going on. And I told him you guys knew what was going on. I told them that they knew that bringing me to this institution was a risk to my safety. That they kept putting my life and limb in jeopardy. I informed him of it after the 2015 attack. After I was attacked in 2015, he came and spoke to me, I informed him of the situation. And I informed him of 2014 and told him I was targeted."

- <u>Deputy Warden Christensen</u>: "When I was moved after the 2014 attack, when I came back to ISCC and was in the hole, I sent concern forms stating I was attacked here multiple times, why does the staff continue bringing me to this institution when my life and limb are in jeopardy. He did a walk in the hole in 2015 . . . . And I happened to catch him and spoke to him about my situation and informed him of what was going on. And informed him about what had happened in the past and why they keep bringing me to this institution, knowing what is going on., and what is happening to me happened to me. Maybe February 2016, right prior to me going

**MEMORANDUM DECISION AND ORDER - 12**

- to IMSI, I spoke with Deputy Warden Christensen. I actually sent him a concern form too, stating the same thing."

- ISCI Transfer Coordinator Lau: "When I was leaving ISCI to ISCC, she was a transporting officer. I stopped by her office and told her I can't go to ISCC. She said why, and I gave her the whole run-down from 2014 to 2015. I told her everything that was going on. She said there was no alerts or anything like that in the computer system so she said there's no way she could tell if I was lying or telling the truth . . . and ultimately I had to move. That's the way the cookie crumbles. If you are on transport, you gotta go. Despite my protesting and everything, besides me getting a DOR for going crazing and not wanting to move, there's nothing I can do at that point; it's out of my hands. This was in 2015, before being transferred from ISCI to ISCC."

- Warden Blades: "In 2014 when I was attacked and I spoke to him, I said I was attacked here, I got jumped and I've received a DOR for that. After speaking with him about that, I spoke with him for a while. He told me to send him an appeal form. I sent him an appeal form . . . . I was targeted and he knew I was targeted. I informed him profusely of moving me to another institution for my protection, in which case he did. He dismissed the DOR and this is 2014, ok'ed my move from ISCC back to ISCI . . . . [W]hen the staff, when they do a move like that, the warden has to call the other warden and inform them of that move. They have to call and say I'm moving Mr. Salazar to your institution and this is why. And they would do that. They're not just going to move somebody for no reason. So Warden Blades knew of a volatile situation because I informed him by mouth. And speaking to him and again 2015 being moved there, I sent him a concern form about this. I'm informing him 2015 and 2016. Wasn't just one time. By mouth and concern form three or four times concerning my safety."

- Director Kempf: "I didn't send him a concern form or anything of that nature . . . . I am suing him because he is the overall of the staff."

See also Pl.'s Opp. to MSJ 3-4 (discussing correspondence with Defendants Bongiovi, Maes, and Lau); Pl.'s Stmt. of Disputed Facts 2-6 (Dkt. 52-1) (discussing correspondence with Defendants Bongiovi, Blades, Christensen, Lau, and Maes).[6]

It is true that these statements clash with the affidavits submitted by Defendants (both in support of their own summary judgment efforts and in opposition to Plaintiff's summary

---

[6] The Court acknowledges the potential admissibility questions orbiting Plaintiff's accounts at this moment, but notes that material in a form not admissible in evidence, but which could be produced in a form admissible at trial, may be used to avoid summary judgment. *See Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003).

**MEMORANDUM DECISION AND ORDER - 13**

judgment motion). *See, e.g.*, Blades Aff. ISO MSJ ¶ 3 (Dkt. 49-3) ("I was not aware of any substantial danger that inmate Salazar faced at IMSI in April 2016."); Bongiovi Aff. ISO MSJ ¶ 6 (Dkt. 49-5) (same); Christensen Aff. ISO MSJ ¶ 3 (Dkt. 49-6) (same); Lau Aff. ISO MSJ ¶ 4 (Dkt. 49-7) (same); Maes Aff. ISO MSJ ¶ 4 (Dkt. 49-8) (same); Christensen Aff. in Opp. to Pl.'s MSJ ¶ 7 (Dkt. 57-2) ("Based on the information that Salazar provided, and my review of his disciplinary history, and the investigations file, I did not find any reason to believe that there was concrete and specific information that was substantiated by the evidence to warrant a 'alert' in Salazar's file."); Blades Aff. in Opp. to Pl.'s MSJ ¶ 10 (Dkt. 57-4) ("While Salazar repeatedly stated that a "red flag" in IDOC's system would have prevented the April 2016 fight, he has failed to acknowledge that there is a process available if he has information about his personal safety that should be taken into consideration when IDOC makes its housing recommendations."). But their import at this stage of the litigation only goes so far in that they highlight the assorted questions of fact surrounding Plaintiff's failure-to-protect claims.

There is a basis to argue that Defendants were not deliberately indifferent to any actual threat of physical harm (assuming there even was one) to Plaintiff if housed with Norteño gang members – either due to Plaintiff's own impressive disciplinary record (*including* the DOR related to the August 28, 2015 altercation) or the fact that Plaintiff never requested protective custody.[7] But drawing all justifiable inferences in Plaintiff's favor (at least when considering

---

[7] Without speaking definitively to the issue, the Court notes that Defendants seem to admit that a request for protective custody is not an absolute pre-requisite for placing an alert in an inmate's file. *See* Pl.'s Reply ISO MSJ 5 (Dkt. 55) ("Salazar states that protective custody is not appropriate for him and an alert should be placed in his file. What he fails to recognize, is that an alert can be placed in his file *by also* requesting protective custody and providing the restrictive housing committee with the information necessary to place an alert in the system.") (emphasis added) (internal citations omitted). Even so, the Court is not convinced that, if there is evidence that an inmate is at risk, IDOC policy nonetheless *requires* a request for protective custody before the inmate can be protected. Rhetorically speaking, at what point is it the responsibility of the prison facility to make that decision under an Eighth Amendment analysis?

**MEMORANDUM DECISION AND ORDER - 14**

Defendants' Motion for Summary Judgment) supports an argument that Plaintiff is indeed someone who Norteño gang members are going to harm if given the chance, and that Defendants knew as much, having initially transferred Plaintiff from ISCC to ISCI following the December 3, 2014 altercation, later transferring Plaintiff from ISCC to IMSI following the August 28, 2015 altercation, and because of Plaintiff's multiple communications and related correspondence on the issue. Notwithstanding the difficulty in keeping track of all such details about large numbers of inmates, the prisons do try to do so and, in this setting, it can be argued that the agency has a duty to keep such information in its institutional records and to consider that information (and even to investigate), particularly when making decisions about Plaintiff's housing. In short, questions of fact exist as to whether Defendants[8] were deliberately indifferent to Plaintiff's risk of harm by not putting an alert/caution/red flag in Plaintiff's file. Dismissing Plaintiff's claims on summary judgment is therefore improper.[9]

### C.  Plaintiff May Pursue Injunctive Relief

Suits in federal court against state officials in their official capacity are limited to suits for prospective injunctive relief seeking to halt an ongoing violation of federal law. *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *see also* 4/7/16 TRO 6 (Court stating that "Plaintiff may also proceed on a claim for injunctive relief against Defendant Kemp,

---

[8] Even so, the Court is persuaded as a matter of law that Warden Blades was not deliberately indifferent. For him, there is no collective history leading up to his involvement. Instead, the record shows that after the December 3, 2014 altercation, Warden Blades took affirmative action to have the DOR dismissed and coordinated Plaintiff's transfer from ISCC to ISCI. These actions are the opposite of deliberate indifference. Defendants' Motion for Summary Judgment is granted in this limited respect. Further, this Memorandum Decision and Order confirms that Plaintiff has not stated a plausible claim for monetary damages against Director Kempf. *See* 4/7/16 IRO 6-7 (discussed *supra*). Therefore, to the extent necessary, Defendant's Motion for Summary Judgment is granted in this limited respect as well.

[9] The opposite is naturally true too, with inferences drawn in Defendants' favor when considering Plaintiff's Motion for Summary Judgment.

**MEMORANDUM DECISION AND ORDER - 15**

who – as the Director of the IDOC – appears to have direct responsibility for the conditions of confinement at Idaho prisons."). Defendants argue that Plaintiff is not seeking prospective injunctive relief and, accordingly, his official capacity claims against Director Kempf should be dismissed. *See* Defs.' Mem. ISO MSJ 5.

It is unclear from the face of Plaintiff's Amended Complaint whether injunctive relief is sought. However, Plaintiff's original Complaint indicated that he was seeking "[a]n injunction against the Idaho Department of Corrections, (Kevin Kempf), that acts to protect inmates from harm . . . ." Compl. 5. Moreover, in responding to Defendants' Motion for Summary Judgment, Plaintiff argues that "[i]n this case injunctive relief is warranted to ensure Plaintiff's future safety while in custody with the Idaho Department of Corrections as well as protect other offenders from the type of assaults that Plaintiff has had to deal with." Pl.'s Opp. to MSJ 4. From this, it cannot be said as a matter of law that Plaintiff is not seeking injunctive relief. Defendants' Motion for Summary Judgment is denied in this respect.

### D.     Plaintiff's Tort Claims Are Dismissed

The Idaho Tort Claims Act ("ITCA") permits claims against government entities "for money damages arising out of its negligent or otherwise wrongful acts or omissions and those of its employees . . . ." I.C. § 6-903. However, before bring such a lawsuit, the ITCA requires that "[a]ll claims against the state arising under the provisions of this act and all claims against an employee of the state for any act or omission of the employee within the course or scope of his employment shall be presented to and filed with the secretary of state within one hundred eight (180) days from the date the claim arose or reasonably should have been discovered, whichever is later." I.C. § 6-905.

Here, Plaintiff contends that Defendants' actions constitute assault and battery and negligence under state law. *See* Am. Compl. 18-20. Such claims require the filing of a tort

**MEMORANDUM DECISION AND ORDER - 16**

claim. Plaintiff did not file such a claim with the Secretary of State within 180 days of the alleged incidents. Therefore, he did not comply with the mandatory requirements of the ITCA and his tort claims must be dismissed.

### III. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' Second Motion for Summary Judgment (Dkt. 49) is GRANTED, in part, and DENIED, in part, as follows:

   a. Plaintiff's claims against Defendant Blades are dismissed. In this respect, Defendants' Motion for Summary Judgment is GRANTED;

   b. Plaintiff's failure-to-protect claims against Defendant Kempf are dismissed. In this respect, Defendants' Motion for Summary Judgment is GRANTED;

   c. Plaintiff's state law claims are dismissed. In this respect, Defendants' Motion for Summary Judgment is GRANTED;

   c. Plaintiff's failure-to-protect claims against Defendants Lau, Christensen, Bongiovi, and Maes are not dismissed. In this respect, Defendants' Motion for Summary Judgment is DENIED; and

   d. Plaintiff may pursue injunctive relief. In this respect, Defendants' Motion for Summary Judgment is DENIED.

2. Plaintiff's Cross-Motion for Summary Judgment (Dkt. 53) is DENIED.

3. Plaintiff's Motion for Leave to File Supplemental Pleading (Dkt. 58) is DENIED.

DATED: September 28, 2018

_____
Ronald E. Bush
Chief U.S. Magistrate Judge